## THE TOWN OF ESSEX vs. ROBERT E. DAY.

A town voted to issue bonds to the amount of $48,000 to raise money to pay its subscription to the stock of a railroad, the bonds to run twenty years, with a right to pay them in ten, and with coupons for semi-annual interest attached. By mistake the bonds were printed without the option clause, and were signed by the first selectman, the treasurer and the special agent of the town without their noticing the error, and in that form were sold. A little before the end of nine years the town passed a vote authorizing the selectmen, if in their judgment advisable, to call in the bonds. Nothing was done by the selectmen however during the following year, it being discovered that the action of the town was premature. A year later, at a meeting not legally called, the town passed a vote directing the selectmen to call in the bonds, and they at once published notice of such a call. Of the forty-eight bonds that had been issued all but six were voluntarily presented and payment accepted. Of these six, four had been originally sold to a person who knew all the facts and by him to the defendant, a few days after the ten years had expired, the defendant having full knowledge of the original vote of the town, of its claim that it had a right to call in the bonds at the end of ten years, and of the votes of the town as to calling them in. In a suit brought by the town two years after the ten years had expired to procure a correction of the bonds held by the defendant, it was held—

1. That though the officers of the town had been negligent in signing and issuing the bonds without such an examination as would have discovered the error, yet as against the defendant, who when he purchased the bonds had full knowledge of the mistake and of the claim of the town with regard to it, and was seeking to take an unjust advantage of the mistake, the town ought not to be denied equitable relief.

2. That the town had not forfeited its claim to equitable relief by delaying for the two years to bring its suit, the defendant having had full notice of the rights claimed by the town and of its refusal to pay interest after the ten years, and the voluntary acceptance of payment by nearly all the holders of the bonds making it reasonable for the town to hope that the expense of a suit might be avoided.

Town of Essex *v.* Day.

3. That although the vote of the town directing the selectmen to call in the bonds was not legal, the meeting not being legally called, and although the action of the selectmen in calling in the bonds was taken under that illegal vote, yet that their action was valid under the vote of the year before, authorizing the selectmen to call in the bonds if they judged it advisable, that vote not limiting any time within which the selectmen were to act.

While it is a general rule that a mistake, to be corrected by a court of equity, must be a mutual one, and must have operated to induce the contract, yet this rule does not apply to a case where the other party knew of the mistake and is seeking to take an unfair advantage of it.

The decree in the case, made some time after the ten years had expired, simply ordered a correction of the bonds by making them ten-twenty bonds instead of bonds for twenty years. Held to be no error that it did not fix a particular time when the correction was to take effect.

And no error that it did not fix a time when the town should cease to be liable on the coupons falling due after the ten years.

And no error that it failed to make any disposition of a counter-claim of the defendant for a recovery of the amount of the coupons that had fallen due after the ten years. These coupons became of no validity after the correction of the bonds, and any judgment upon the claim must have been adverse to the defendant.

[Argued January 20th—decided June 8th, 1885.]

SUIT for the correction of certain bonds issued by the plaintiffs, which were in terms payable at the end of twenty years from their date, but which were intended to be issued with a provision that the town might at its option pay them in ten years from date; brought to the Superior Court in Middlesex County. The following facts were found by a committee :—

On the 25th day of September, 1869, the town of Essex subscribed for four hundred and eighty shares of the capital stock of the Connecticut Valley Railroad Company, and on the 27th day of April, 1870, directed the issue of town bonds to the amount of $48,000 to pay for the stock.

The action of the town with regard to the issuing of the bonds was, in detail, as follows :—

At a town meeting duly warned, and held on the 12th day of January, 1874, it was voted—"that William Dennison, Jared E. Redfield and William C. Hough be a committee to prepare and report a proper plan for the issuing of the bonds of this town that may be requisite to pay the subscription

of the town to the capital stock of the Connecticut Valley Railroad Company, at such time as directed by vote of a future meeting of the town."

At a special meeting held on the 27th day of April, 1870, the committee made the following report:—" That the town issue coupon bonds of the denomination of one thousand dollars each, numbered from one to forty-eight consecutively, to be payable at the option of the town in ten years from date, and due in twenty, denominated ten-twenty bonds, bearing interest six per cent. per annum; the interest payable semi-annually; said bonds to be similar in form to bonds issued by other towns interested in the road, and to be sold at not less than par, at such times as shall meet the demand of the president and directors of the road, and that the same be carried into effect by the adoption of a resolution that the selectmen of the town be agents of the town to see that the bonds are properly numbered, dated and signed by competent authority, and sell the same when necessary to meet installments as they become due from the town."

The town passed the resolution recommended and the selectmen at once entered upon their duties under it. They did not intend to have the bonds printed as they were printed, as below stated, but did intend that they should be printed so as to be payable at the option of the town in ten years from their date.

The printing of the bonds was procured by James C. Walkley, the president of the railroad company, who attended to that duty for Essex and other towns. He did it for Essex at the request of C. O. Spencer, agent of the town, who gave him a written memorandum which Mr. Walkley gave to the Kellogg & Bulkeley Printing Company, and which called for ten-twenty bonds only. The printing company consulted with Mr. Walkley as to the general form of the bonds, and showed him blank forms of bonds; but the bonds were printed twenty-year bonds by mistake in the printing. The bonds as printed were returned to the agents of the town, and " competent authority " appointed

Town of Essex *v.* Day.

by the selectmen signed them and they were then left with
the town treasurer to be sold. There were in all forty-eight
bonds of $1,000 each. Of these bonds the four in question
in this case were sold about January 1st, 1870, to F. A.
Tiffany, then a citizen of the town of Essex. Each bond
had attached interest coupons payable every six months
through the twenty years from date. The following was the
form of the bonds in question, all being alike except as to
the number :—

"EXEMPT FROM TAXATION.

"No 41, BOND ($1,000) OF THE TOWN OF ESSEX.

" *Know all men by these presents*, That the town of Essex
acknowledges itself indebted and firmly bound unto Francis
A. Tiffany, or bearer, in the sum of one thousand dollars,
which sum said town hereby promises to pay to said Francis
A. Tiffany, at the office of the town treasurer, together with
the interest thereon at the rate of six per cent. per annum,
which interest shall be payable semi-annually on the first
days of April and October, in each year, at said bank, on
the surrender of the corresponding interest warrants hereto
attached. This bond is issued in accordance with a legal
vote of said town passed April 27th, 1870, and is payable
twenty years from date. It is one of a series issued to meet
the indebtedness of the town incurred by a subscription of
forty-eight thousand dollars to the stock of the Connecticut
Valley Railroad, and must be signed by the first selectman
and treasurer of said town and countersigned by the agent
appointed to subscribe for said stock or by his lawful suc-
cessor.　　　　" GILES POTTER, *First Selectman.*
　　　　　　　" EDWARD W. REDFIELD, *Treasurer.*
　　　　　　　" CARNOT O. SPENCER, *Agent.*
" Dated at Essex, Conn., April 1st, 1870."

At the time the town treasurer signed the bonds he
signed them supposing they were payable at the option of
the town in ten years from their date. He signed them all
without reading any of them. The bonds were left with
the town treasurer for delivery to purchasers. It did not

appear in evidence that any agent of the town noticed the form of the bond, or noticed that it did not contain the option to redeem in ten years, but it was assumed to be correct.

At the time Tiffany bought the bonds the then town treasurer, Edward W. Redfield, told him that the bonds were ten-twenty bonds, and at the option of the town could be called in and paid at the expiration of ten years from their date, and that such was the vote of the town in authorizing the issue of the bonds. But Tiffany did not care whether the bonds were redeemable in five, ten or twenty years, and would have bought them as readily in the one case as in either of the others.

Tiffany sold these bonds in the autumn of 1878 to Daniel S. Swan. Before Swan bought them he called upon the then town treasurer in relation to the bonds, and to know what the action of the town would be, and the treasurer told him what the vote of the town was in authorizing the issue of the bonds, and that the town would call them in at the expiration of ten years from their date, and pay them up; and that the town had already called them 'in, but by mistake they had been called a year too soon.

Swan sold these bonds to the defendant April 20th, 1880, at a premium of not over two per cent. The defendant at the time of his purchase had full knowledge of the vote of the town in relation to the issue of the bonds, and that the town had called them for payment.

The action of the town with regard to calling in the bonds was as follows:—

At the annual town meeting held on the 7th day of October, 1878, the following vote was passed:—

" *Voted,* That the selectmen be and they hereby are authorized (if in their judgment it seems advisable) to call in the bonds issued by the town, amounting to forty-eight thousand dollars, and to issue new bonds at a lower rate of interest."

Nothing was done during the following year under this

vote. At a special meeting held on the 7th day of February, 1880, the following vote was passed:—

"*Voted*, That the following vote of the town of Essex, passed at its annual meeting, held on the seventh day of October, 1878, be and is hereby ratified and confirmed, viz.: That the selectmen be, and they are hereby authorized, (if in their judgment it seems advisable,) to call in the bonds issued by the town, amounting to forty-eight thousand dollars, and to issue new bonds at a lower rate of interest. And it is further voted that the selectmen be, and they are hereby authorized and instructed to procure and cause to be issued bonds to an amount not exceeding in the aggregate forty-eight thousand dollars, or so many as may be necessary to redeem said bonded indebtedness, in sums of one thousand dollars each, bearing date April first, 1880, and payable in twenty years from said date, but redeemable at the option of the town at any time after ten years from said date, at a rate of interest not exceeding four and one half per cent. per annum, payable semi-annually, to wit, on the first day of October and April in each year, at the Saybrook National Bank of Essex. Said selectmen shall advertise to receive sealed proposals for the same, reserving the right to reject any and all bids which may not be considered for the interest of the town ; and no proposals at less than the par value of said bonds shall be considered by said selectmen. The proceeds of the sale of said bonds shall be used for the redemption and payment of the present bonded indebtedness of the town, which outstanding bonds shall be redeemed and destroyed by the selectmen and a record made of the same including the numbers thereof. And it is further voted that Edward W. Redfield, treasurer of the town be, and he hereby is, authorized and directed to sign said bonds, and keep a record as the law directs."

This meeting proved not to be legally called, having been warned on the third to be held on the seventh of February, which allowed less than the five days required by law between the warning and the time of the holding of the meeting.

On the 25th of February, 1880, the town gave notice by publication in various newspapers that the bonds would be paid at the office of the treasurer on the 1st of April, 1880, and that interest upon them would cease at that time.

None of the agents of the town appear to have had any knowledge that there had been a mistake in the issue of the bonds until the town was informed, after February 25th, 1880, by the Chelsea Savings Bank, a holder of some of them, that the bonds on their face were twenty year bonds and not redeemable before. The town, after notice from the Chelsea Bank, did not give notice to the public of the vote of the town. All the bonds issued have been surrendered and paid except the bonds in suit and two others held by the defendant as guardian of his daughter.

The interest coupons on these bonds have been paid up to April 1st, 1880. None of them have been paid since. Nor has the principal been paid, although the plaintiff has been ready to pay it. The defendant objected on the trial of the case to the introduction in evidence of the records of the town directing the issue of the bonds, and to the testimony showing the price paid by the defendant for the bonds. These objections were overruled and the evidence admitted.

The defendant filed a counter-claim, demanding payment of the coupons due October 1st, 1880, April 1st, 1881, October 1st, 1881, and April 1st, 1882; the plaintiffs denied the defendant's right to recover upon them.

Upon these facts the court (*Sanford, J.,*) rendered judgment for the plaintiffs and for a correction of the bonds by inserting in them an option on the part of the plaintiffs to pay them at the expiration of ten years from their date. The defendant appealed.

*G. G. Sill,* for the appellant.

1. The mistake arose from the gross negligence of the plaintiffs, and equity will not assist a person whose condition is attributable only to the want of that diligence which may fairly be expected from a reasonable person. Kerr on

Fraud and Mistake, 407, 408, and notes; *Iverson* v. *Wilburn*, 65 Geo., 103; *Brown* v. *Fagan*, 71 Misso., 563; *Witthaus* v. *Schack*, 57 How. Pr. R., 310.

2. If the defendant had the information that could be obtained from inspecting the records of the town, yet he had a right to rely on the recitals and words of the bond. 2 Edw. on Bills, § 876; *Anthony* v. *County of Jasper*, 101 U. S. Reps., 693; *Menasha* v. *Hazard*, 102 id., 81. These recitals estop the town. Bigelow on Estoppel, 3d ed., 469; *Lane* v. *Town of Embden*, 72 Maine, 354; *Town of Coloma* v. *Eaves*, 92 U. S. Reps., 484; *Supervisors* v. *Galbraith*, 99 id., 214; *Orleans* v. *Platt*, id., 676.

3. The alleged mistake was not mutual, nor the determining point of the transaction. Both of these incidents are necessary. 2 Swift Dig., 96; Kerr on Fraud and Mistake, 408, 435, and notes; Willard's Eq., 69; *Segur* v. *Tingley*, 11 Conn., 135; *Thompsonville Scale Manuf. Co.* v. *Osgood*, 26 id., 16; *Brainard* v. *Arnold*, 27 id., 617; *Laidlaw* v. *Organ*, 2 Wheat., 178, 195; *Sable* v. *Maloney*, 48 Wis., 331; *Petesch* v. *Hambach*, id., 443.

4. The plaintiffs forfeited whatever right they had to equitable aid by their delay in bringing their suit. They had no right to thus wait and watch the uncertain tides of finance.

5. If the town had the right of option which it seeks, yet it could not now avail itself of it, because it did not exercise the right at the end of ten years. The town meeting at which the selectmen were instructed to call in the bonds was not legally warned and all its proceedings were of no effect. *Hayden* v. *Noyes*, 5 Conn., 391; *Brooklyn Trust Co.* v. *Town of Hebron*, 51 id., 22. It is true that this point was not made in the court below, the defendant's counsel having failed to notice the exact date of the warning, but the court has full power to take notice of an error not assigned and reverse the judgment on account of it. *Sturdevant* v. *Stanton*, 47 Conn., 579. And the court will not be disposed to affirm a judgment resting upon such an illegality.

6. The decree is erroneous in not requiring that the coupons falling due after the ten years should be paid, as also in making no disposition whatever of the defendant's counter-claim, in which he asked for a decree for their payment. Also in not fixing a time when the correction should become operative.

*J. Phelps* and *M. E. Culver*, for the appellees.

LOOMIS, J. It is not necessary for us to consider in this case whether the bonds issued by the town are to be regarded as negotiable and therefore protected in the hands of a *bonâ fide* holder against the correction which the plaintiffs seek to procure. We may assume for the purposes of this case, that, in the absence of notice on the part of the defendant of the error claimed by the plaintiffs to have intervened in the printing of the bonds, the correction could not be made.

Starting with this assumption, the questions which present themselves for consideration are the following :—

1. Have the plaintiffs, through their agents, been guilty of such negligence, either in the original execution and issuing of the bonds, or in the seeking of a correction of the error when discovered, as precludes them from the equitable relief which they seek ?

2. Did the first purchaser of the bonds, and afterwards the purchaser from him, and finally the defendant at the time of his purchase, have such knowledge of the error in the bonds, either actual or to be imputed, as gives the plaintiffs a right, as against them, to the equitable relief which they seek ?

3. Was the error one of such a character that it can be corrected by a court of equity ?

4. Supposing the plaintiffs not to be precluded by their own negligence from the relief sought, and the defendant not to be protected by want of notice, has the town so far exercised its claimed right of option to call in the bonds at

the end of ten years, as to stand in a position to assert the equitable rights which it claims?

These are the principal questions in the case, each covering some minor questions that do not need to be stated separately; besides which there are some questions made with regard to the decree which lie wholly outside of these principal ones and which, though not of great importance, will need some notice.

1. And first—Have the plaintiffs been guilty of a fatal negligence? They had made a reasonable provision for the printing of the bonds, and for the printing of them as ten-twenty bonds. It is found that the town agent gave to Mr. Walkley, who procured the printing of the bonds for all the towns, a written memorandum of the bonds to be printed for the plaintiffs, "which called for ten-twenty bonds only," and that Mr. Walkley delivered this memorandum to the printing company. The plaintiffs so far therefore had used reasonable care. It is only in the execution and issuing of the bonds that the negligence exists. It is found that none of the agents of the town who subscribed the bonds, namely, the first selectman, the treasurer and the special agent, observed the mistake, and that they were in fact all ignorant of it until several years later, when the Chelsea Savings Bank called their attention to it. It is specially found that the treasurer, who was charged more especially with the duty of vigilance in every thing affecting the finances of the town, signed the bonds without reading them, supposing that they were payable at the option of the town in ten years, and it may be assumed that none of the signers read them, or read them with proper attention. There is here unquestionably a reprehensible carelessness; a lack of intelligent attention to the matter that must be regarded as not only unreasonable but culpable. We have no disposition to defend, or even to excuse, such conduct. The question however, as we conceive, is not so much whether a culpable negligence existed, as it is, whether such negligence should operate to bar the plaintiffs from relief against this defendant. This negli-

gence is not of that extremest kind which the courts some-
times characterize as the equivalent of fraud. It was not
recklessness; it was mere want of care. There was no
indifference to the effect; it was simply an honest assump-
tion that all was right. It is to be classed only with those
incautious and unbusiness-like acts which are constantly
presenting themselves and would not have been noticed but
for some mischief that they have wrought. Thus a man
carelessly signs a note for a thousand dollars which he sup-
posed to be for a hundred dollars. Through a mistake of
the scrivener it is thus written, when he had directed that
it be written a hundred, and he signs it without reading it.
This is certainly gross carelessness; but should it debar him
from all remedy against a party who receives the note
knowing of the mistake? Would not a court of equity
enjoin the holder who took it with full knowledge against
its collection? Would it be good in his hands, in any court
admitting of equitable defences, for more than a hundred
dollars? We think therefore that the negligence of the
plaintiffs in the execution and issuing of the bonds, was
not of such a character as to preclude all equitable relief
against the present defendant.

But it is claimed by the defendant that, if this be so, yet
the plaintiffs have been guilty of such negligence in the
assertion of their equitable rights as to preclude them from
relief. And it is a well settled rule that a party who dis-
covers some fact against which he needs equitable protec-
tion, like an error in a deed or a judgment rendered against
him without notice, must use diligence in seeking equitable
aid. But this is required for the purpose mainly of pro-
tecting other persons against loss by reason of the unasserted
right. If the records show a title in a third person, that
third person, even after notice, may convey to an innocent
purchaser. In all these cases delay is likely to add to the
complication, and make the equitable adjustment of rights
more difficult. In the present case the plaintiffs with every
day's delay ran the risk of a transfer of the bonds by the
parties who held them to *bonâ fide* purchasers. This was how-

ever their risk and not that of the public; certainly not upon
an assumption that the error could not be corrected against
a holder who had no notice of the mistake. In this case
the defendant purchased the bonds in question, not only of
a holder who had notice of the mistake, but with personal
knowledge of it, and after the town had voted to call in all
the bonds at the end of the ten years, and had given notice
by publication in various newspapers that the bonds would
be then paid and that interest upon them would cease at
that time. Whatever delay the plaintiffs made after that
time could not therefore injuriously affect the defendant.
They of course ran the risk of a sale by him of the bonds
to an innocent purchaser; but that was wholly their risk;
it involved no risk to him. The public notice given by the
plaintiffs of the payment of the bonds at the end of ten
years, was given on the 25th of February, 1880. The ten
years expired April 1st, 1880. The defendant purchased
the bonds in question on the 20th of April, 1880. The
present suit was brought in May, 1882, two years later. We
can not say that this delay was, in the circumstances, fatal
to the plaintiffs' right to equitable relief. It was not, we
think, unreasonable for the plaintiffs to expect that, after
the notice given, the holders of the bonds would accept
payment without contesting the matter, and that they should
have been confirmed in that expectation and so the more
inclined to save the expense of a law suit, by the fact that
forty-two out of the forty-eight bonds were thus brought in
and cancelled.

2. Did the first purchaser of the bonds in question, and
afterwards the purchaser from him, and finally the defen-
dant at the time of his purchase, have such knowledge of
the mistake, either actual or to be imputed, as gives the
plaintiffs a right, as against them, to the equitable relief
which they seek?

The finding upon this point is as follows:—" Before
Tiffany (the first purchaser) purchased the bonds, the then
town treasurer, E. W. Redfield, told him that the bonds
were ten-twenty bonds, and at the option of the town

could be called in and paid at the expiration of ten years from their date, and that such was the vote of the town authorizing the issue of the bonds. Before Swan (the second purchaser) bought the bonds of Tiffany he called upon the then town treasurer in relation to them, and to know what the action of the town would be, and the treasurer told him what the vote of the town was in authorizing the issue of the bonds, and that the town would call them in at the expiration of ten years from their date and pay them up; and that the town had already called them in, but by mistake they had been called in a year too soon. Swan sold the bonds to the defendant April 20th, 1880. The defendant, at the time of the purchase, had full knowledge of the vote of the town in relation to the issue of the bonds, and that the town had called them for payment."

It is difficult to see how this information can be regarded as anything less than information of the fact of the mistake. A knowledge of the vote of the town necessarily involved a knowledge that the bonds were not drawn in accordance with the vote. It is of course barely possible that the defendant may have supposed that the town relied upon its vote as giving it the power to call in the bonds in ten years, without any provision to that effect in the bond; thus making their mistake one, not of fact, but as to the legal effect of their action. This, however, seems to us a forced and unnatural construction. We think the only reasonable view of the matter is, that the defendant knew, or had such information that the law would impute to him knowledge, that the bonds were by mistake issued as twenty year bonds instead of ten-twenty ones.

3. Was the mistake one of such a character that it can be corrected by a court of equity?

° It is claimed by the counsel for the defendant that the mistake, in such a case, must be mutual, and the cause of the agreement, and numerous authorities are cited in support of the proposition.

This rule, within the limits of its proper application, is founded in reason. If a contract is corrected by a court of

Town of Essex *v.* Day.

chancery to make it conform to the intention of one of the parties, it is of course forcing a contract upon the other party which he never intended to make, unless his own intent concurred with that of the other party. But this case is not of that character nor governed by that rule. A grantor by mistake embraces in his deed a parcel of land that neither party intended to have conveyed. The grantee sees his mistake, but does not call the attention of the grantor to it, and afterwards claims the parcel thus accidentally conveyed. Or a person offers a reward of $100 for the detection and arrest of a burglar, but by mistake and without his notice it is printed $1,000. A man who knows of the mistake arrests the burglar and claims the $1,000. In each of these cases the error is not mutual, but wholly on the one side. What is there on the other? Not mistake, but fraud. That fraud can never stand for a moment in a court of equity. But suppose the case to be one where, instead of actual fraud, there is merely such knowledge, actual or imputed by the law, as makes it inequitable for the purchaser to retain his advantage. The court will deal as summarily with that inequitable position of the party, as in the other case with his fraud.

Kerr, in his work on Fraud and Mistake, p. 409, after speaking of the general rule that mistakes must be mutual, says:—" The mistake of one party only is attended by different consequences, according as the other party is or is not *cognizant of the mistake.*   \*   \*   \*   An agreement cannot be affected by the mistake of either party in expressing his intention, *of which the other party has no knowledge.*" Again he says, on the same page:—" A man can not have relief on the ground of mistake, unless the party benefited by the mistake is disentitled in equity and conscience from retaining the advantage which he has acquired." Numerous authorities are cited in support of this proposition which we will not take time to consider.

It is however claimed, on the part of the defendant, that the mistake must have been one that induced the contract on the part of the purchaser; that is to say, that the pur-

chaser must have taken the bonds for the very reason that they were twenty year bonds and not ten-twenty ones. But it is obvious that the hardship attending the correction of a contract is all the greater where the other party accepted the contract for the reason that he supposed himself to be acquiring what the correction of it deprives him of. But supposing the purchasers of the bonds in question had taken them in entire indifference as to whether they were twenty year or ten-twenty bonds, and that the defendant was now endeavoring to assert rights under them to which he had before been indifferent, would there be no remedy in equity? Can it be claimed for a moment that equity, which deals with substance and not mere form, which applies reason and not mere arbitrary rules, would see no substantial difference between the case of a party who, when he accepted the contract, was indifferent with regard to a known mistake and so remained, and one who, at first indifferent, was now trying to take an unjust advantage of the mistake?

We conclude, therefore, that there was nothing in the nature of the mistake, or in the relation of the parties to it, that should lead a court of equity to refuse the relief sought.

4. Has the town so far exercised its claimed right of option to call in the bonds at the end of ten years, as to stand in a position to assert the equitable rights which it claims?

It appears by the finding that the town, at a legal meeting held on the 7th day of October, 1878, voted "to authorize the selectmen of the town (if deemed advisable) to call in the bonds," &c. This vote left it to the discretion of the selectmen, and did not in itself constitute a calling in of the bonds. Nothing was done during the ensuing year under the vote, as it was discovered that the bonds could not be called in until a year later.

Another town meeting was called on the 3d and held on the 7th of February, 1880, at which the selectmen were instructed to call in the bonds. This action of the town

covered the whole ground, and if legal, would have con-
stituted, in the fullest manner, a calling in of the bonds.
It was not, however, a legal meeting, having been called on
the 3d of February and held on the 7th—not leaving the
time required by law between the warning and the holding
of the meeting. *Brooklyn Trust Co.* v. *Town of Hebron*, 51
Conn., 22. This point does not seem to have been made
in the court below, and we do not feel bound to consider it
for the sake of reversing a judgment. We will, however,
in view of this illegality, lay this meeting out of the case.
If this is done, we are compelled to fall back on that of the
year before. That, it will be seen, referred the matter of
the calling in of the bonds to the selectmen. The vote did
not limit itself in the matter of time, or require the exercise
of their discretion by the selectmen within any limited
period. The action of the selectmen one year later was,
of course, authorized by it. Now we do not find the action
of the selectmen stated in express terms in the finding, but
it is found that " the town, on the 25th of February, 1880,
gave notice by publication in various newspapers that said
bonds would be paid at the office of the treasurer on the
1st of April, 1880, and that interest upon them would cease
at that time." The town, except in its assembled action in
town meeting, acts through its selectmen, and it may be
taken for granted that this notice was signed by the select-
men, and was therefore their action under the vote author-
izing them to call in the bonds. Thus the bonds were
called in by the selectmen under authority of the vote of
the year before, their action losing none of its validity or
effect by reason of its being taken under the vote of the
later meeting, then supposed to be legal, but since dis-
covered not to have been so.

It may perhaps be said that, if the selectmen acted in the
belief that the vote of February, 1880, was a legal one, and
therefore under it, they were merely obeying a positive
order of the town, and not exercising their judgment on the
question whether the calling in of the bonds was advisable.
But the selectmen having in fact called in the bonds, and

Town of Essex *v.* Day.

having clearly the power to do so, the question how far they acted according to their best judgment is one that cannot be made by an outsider like the defendant. If we look at the facts that appear, it is hardly possible to escape the conclusion that the selectmen concurred in the prevailing opinion of the people of the town that it was best to call in the bonds. But, without assuming this, it is sufficient that the selectmen acted with full power, and that no fact is found which tends in any manner to show that they did not act according to their best judgment, and precisely as they would have acted if the vote of October, 1878, was the only one under which they attempted to act.

This, we believe, disposes of the principal questions in the case. Certain other questions are made as to the correctness of the decree, even if the plaintiffs were entitled to relief.

It is said that the decree does not fix the time when the correction of the mistake is to operate, whether from the date of the bonds, the commencement of the suit, or the date of the decree. But it is clear that the correction of the mistake is merely to make the bonds ten-twenty bonds, just as if they had been so printed at the outset. No particular time needed to be named. The bonds simply become changed from what, by the mistake, they are, into what the town intended that they should be ; and the rights of the defendant are just what they would have been if the bonds had been made right at first.

It is further claimed that the decree is erroneous in not making any disposition of the defendant's counter-claim. This counter-claim was for the recovery of the amount of the several coupons that had matured since April 1st, 1880. But if the bonds are corrected so as to be ten-twenty bonds, then clearly the defendant had no right to collect the coupons maturing after the ten years had expired and the bonds had been called in.

The further claim that the decree is erroneous in not fixing the date when the town was or should be excused from paying its coupons is answered by what we have last

said.   The bonds becoming ten-twenty bonds, the time when the town ceases to be liable on its remaining coupons is when the ten years have expired and the town has called in the bonds.

We ought perhaps to notice a consideration bearing upon the general question of the plaintiffs' equity, which is urged by the defendant's counsel.   They say that the plaintiffs, in delaying to bring their suit for so long a time after they learned of the mistake in the bonds, were "watching the uncertain tides of finance," and regulating their action accordingly.   But if the bonds had originally been ten-twenty bonds the plaintiffs were not bound to call them in at the end of ten years, and had the right to watch the money market and determine their action by its condition and prospects.   They were not bound to publish their intentions until such a time before the expiration of the ten years as reasonable notice to the holders of the bonds would require.   And in applying to a court of equity for the correction of the bonds, they were not committing themselves at all to the policy of calling in the bonds. They were simply securing a right of option, which, when secured, they could exercise or not, wholly at their own pleasure.

There is no error in the judgment.

In this opinion GRANGER and BEARDSLEY,* Js., concurred.

CARPENTER, J. (dissenting.)   In reforming written instruments the defective instrument and the real contract between the parties must be alleged in the complaint. *Thompsonville Scale Manufacturing Company* v. *Osgood*, 26 Conn., 16.   It is not claimed that any contract was ever made with the defendant except that contained in the bond. If that was all—that is, if it was conceded that no other contract existed between these parties, it would be a pretty

---

* Judge BEARDSLEY of the Superior Court was called in to sit in the case in the place of Judge PARDEE, who was absent by reason of ill health.

bold claim that a court of equity had power to change that contract. Let us then examine the transaction critically and see what evidence there is of any other contract with the defendant or with those in privity with him.

In January, 1870, preliminary steps were taken by the plaintiff to issue bonds. Bonds of a certain description were authorized in April. Prior to January, 1871, bonds were prepared and placed upon the market by the agents of the town. The town voted that the bonds should be payable at the option of the town in ten years and that they should be due in twenty years. By mistake the option clause was omitted.

About the first of January, 1871, one Tiffany commenced negotiations for the purchase of the bonds in question. At that time the bonds were printed and signed, bearing date April 1st, 1870. Both parties knew or had ample means of knowing just what they contained. Whatever mistake was made was made before that time, and, obviously, was the mistake of the town alone; for Tiffany was in no sense a party to the transaction. There was then existing no parol contract with him.

The town had prepared certain bonds and proposed to sell them, and he was willing to buy. The agent of the town informed him that the town had the right to redeem the bonds before the expiration of the twenty years; that the bonds were ten-twenty bonds, and at the option of the town could be called in and paid at the expiration of ten years from their date; and that such was the vote of the town issuing the bonds. Tiffany took no pains to inform himself what the vote of the town was, because he did not care whether the bonds were redeemable in five, ten or twenty years. He bought the bonds. That is all the finding on that subject.

Now it will be observed that the negotiations related to existing bonds, and not to bonds to be subsequently prepared pursuant to any agreement they might make. There was no contract that the bonds should be of a certain description. Tiffany made no agreement whatever in relation to

that matter.· As to that he was totally indifferent. The town simply represented that an article which it had to sell was of a certain description.· Tiffany neither assented to it nor denied it, as it was of no consequence to him. It was simply a sale of the bonds as they were, without warranty or other agreement. The contract was fully executed when he received the bonds and paid for them. The legal result was that the town then became obligated to pay the amount of the bonds according to .the terms and conditions named in them. No other .executory contract existed between the parties. To torture that transaction into an agreement by Tiffany that the bonds should be as represented by the town, is an unprecedented stretch of judicial power.

But the plaintiff must not only show that there was such a contract, but also that Swan, a subsequent owner of the bonds, and the defendant, had notice of it when they purchased.

In respect to Swan. The first finding is that " at the time Swan bought them he knew that the town claimed the right to call them ·in at the expiration of ten years from date, and that they intended to do so." And the supplemental finding is as follows: " Before Swan bought the bonds of Tiffany he called upon the then town treasurer in relation to them, and to know what the action of the town would be,.and the said treasurer told him what the vote of the town was in authorizing the issue of the bonds, and that the town would call them in at the expiration of ten years from their date, and pay them up; that the town had already called them in, but by mistake they had been called a year too soon."· ·

Here is no verbal agreement between Swan and the ·town, and there is not the slighest intimation that Swan had ·any knowledge whatever of any agreement with Tiffany. .

· How is it ·with the defendant? In respect to him the finding is as follows: " Swan sold these bonds to the defendant April 20th, 1880, at a premium of not over two per cent. The defendant at the time of his purchase had full knowledge of· the vote of the town in relation to the issue

of the bonds, and that the town had called them for payment."

What is the effect of such knowledge? It gave the defendant no notice of any contract with Tiffany, and there is no other evidence that he had such notice. Whatever therefore may be said of the transaction between the town and Tiffany, nothing occurred that will bind the defendant. If he is liable at all it is because of some implied agreement with him, or of circumstances equivalent to such an agreement. The only evidence of such circumstances or implied agreement is the extract from the finding just quoted. If found there it is because the defendant then knew of certain facts. Now it is true that mere knowledge will often subject a man to pre-existing equities; but how it can be regarded as sufficient evidence of a contract, or, in law, as the equivalent of a contract, is beyond my comprehension. Will it be seriously contended by any fair-minded man that the defendant's knowledge of the vote of the town, of its action in calling the bonds, and if its claim in respect thereto, is equivalent to a contract that the bonds were and should be as the town claimed they ought to be? These bonds had been in existence ten years; he found them in the market; he knew the claims of the town in respect to them; but he knew at the same time that they were not in fact as the town claimed them to be. Under these circumstances he had a perfectly legal, equitable and moral right to purchase them, relying upon the liability of the town as therein expressed. A judicial decree changing them to his prejudice is arbitrary and unwarranted, and a decree for which I am sure no precedent can be found.

But suppose that I am wrong as to the facts, and in my conclusions therefrom; even then I say the law will not justify such a decree. "There are two requisites essential to the exercise of the equitable jurisdiction in giving any relief, defensive or affirmative. The fact concerning which the mistake is made must be material to the transaction, affecting its substance and not merely its incidents; and the mistake itself must be so important that it determines the

conduct of the mistaken party or parties." Pomeroy's Eq. Jur., § 856.

" Mistake in matter of law or matter of fact, to be a ground for equitable relief, must be of a material nature, and must be the determining ground of the transaction. A man who seeks relief against mistake, must be able to satisfy the court that his conduct has been determined by the mistake. Mistake in matters which are only incidental to, and are not of the essence of a transaction, and without or in the absence of which it is reasonable to infer that the transaction would nevertheless have taken place, goes for nothing. If the mistake has not been the only cause by which the conduct of a man has been induced, but another motive has intervened, the mistake cannot be set up as a ground of relief." Kerr on Fraud and Mistake, 408. " The rule as to ignorance or mistake of facts entitling the party to relief, has this important qualification, that the fact must be material to the act or contract, that is, it must be essential to its character, and an efficient cause of its concoction. For though there may be an accidental ignorance or mistake of a fact, yet if the act or contract is not materially affected by it, the party claiming relief will be denied it." 1 Story Eq. Jur., § 141.

It cannot be said that the mistake concerned the substance of the transaction; it concerned a mere incident, and that an unimportant one. The object was to effect a loan; the time of its continuance, whether ten or twenty years, was then of trifling importance to the town; and the option clause was perhaps of still less importance. Time was not of the essence of the contract. In either event the town was reasonably accommodated. If the bonds were to run twenty years absolutely, the rate of taxation could be adapted to it; if redeemable in ten years they could still run twenty years, or bonds at a lower rate of interest could be substituted for them at the pleasure of the town. But at that time it could not be known whether the option clause would be of any advantage. So in any event it was of little consequence and by no means an essential feature

of the transaction. In the absence of any finding that it was material, this court cannot presume that it was.

And how and where does it appear that the mistake induced the loan? that it determined the action of the town? that the town, had it known that the option clause was omitted, would not have accepted the loan? On this point the record is silent. How then can the town have the relief asked for without disregarding or overriding an essential principle of equity of universal application in this class of cases? This is a point the town must show affirmatively, and it has wholly failed to do so.

But I go further, and insist that the probability is that the agents of the town did know of the omission before the bonds were sold, and that they sold them knowingly— in short, that *there was no mistake.*

There is no direct explicit finding that there was a mistake. It is found that a mistake occurred in printing the bond, but the essential thing is, and that is not found, that the mistake was unknown when the bonds were sold and the money received.

At this point let us glance at what the law requires:— "Whether the contract contains more, or less, than the agreement of the parties, or something different, if the mistake is made out by proofs *entirely satisfactory*, equity will reform the contract so as to make it conform to the precise intent of the parties. But if the proofs are doubtful and unsatisfactory, and the mistake is not made entirely plain, equity will withhold relief." 1 Story's Eq. Jur., § 152. This principle was recognized and enforced by this court in *Bishop* v. *Clay Fire Ins. Co.*, 49 Conn., 167.

Now look at the finding:—" It did not appear in evidence that any agent of the town noticed the form of the bond, or noticed that it did not contain the option to redeem in ten years, but it was assumed to be correct." " None of the agents of the town appear to have had any knowledge that there had been a mistake in the issue of the bonds, until the town was informed, after February 25th, 1880, by the Chelsea Savings Bank, a holder of some of them, that

the bonds on their face were twenty year bonds, and not redeemable before."

That is all there is upon this vital point in the case, the mistake itself. That is found only in this vague and ambiguous language. "It did not appear in evidence that any agent of the town noticed the form of the bond, &c." But did it appear in evidence that they did not? That is the important inquiry; and the report gives us no answer, except by its silence. And such an answer must be regarded as a negative one.

But we are told that this must be regarded as equivalent to a finding that they did not know that there was a mistake. I think otherwise. The learned committee understood the use of language, and had he intended to find that fact he would have done so in terms not to be misunderstood, and would not have left it to inference, and a doubtful inference at that. And so of the other expression :— "None of the agents of the town appear to have had any knowledge, &c." If by this he intended that they did not have knowledge, why did he not say so?

Suppose that the then agents of the town had testified that they did not remember as to a transaction that took place ten years before; that they had forgotten about it; that they had no recollection of noticing the mistake, &c.; in that state of the testimony a cautious trier might express himself in the language quoted:—"None of the agents *appear*, &c." Can we not see in that careful and somewhat peculiar expression not only an unwillingness but a refusal to find the fact? To me it is perfectly clear that it is not such a finding as the law requires.

Again, there is negative evidence of great significance that the view I take of this finding is the correct one. The quotations above are from the first report of the committee. The case was recommitted with directions to the committee "to hear further evidence and make additional report of the facts found on such evidence." In the second report we find this clause: —"At the time the town treasurer signed the bonds, he signed them supposing they were

payable at the option of the town in ten years from their date. He signed them all without reading any of them. The bonds were left with the town treasurer for delivery to purchasers."

That is an explicit and unequivocal statement as to the knowledge of one of the three men who signed the bonds. We should expect to see, yea more, it is morally certain that we should have seen, an equally clear and explicit statement as to the knowledge of the other two men, if the evidence would justify it. The three signers were Giles Potter, first selectman, Edward W. Redfield, treasurer, and Carnot O. Spencer, agent. The treasurer does not appear to have had anything to do in preparing or causing to be prepared the bonds. It was made the duty of the selectmen by vote of the town to see that the bonds were "properly numbered, dated and signed by competent authority." The knowledge or want of knowledge of these men was the all-important inquiry. They knew about it if any one did, and they were doubtless called as witnesses. However that may be, the committee heard the evidence, had this matter in mind, knew its importance, and could only make this tame and inconclusive statement immediately following that quoted above :—" The agents of the town did not intend to have the bonds printed as they were printed, but did intend that they should be printed so as to be payable at the option of the town in ten years from their date." This part of the finding is silent as to their knowledge, and that silence is significant. To me the inference is necessary and conclusive that the evidence did not warrant the committee in finding that these men had no knowledge of the mistake at the time the bonds were issued. Unless that fact is clearly established by proof and found by the court the plaintiffs have no case. And I submit that the fact does not appear in this case.

But suppose that I am wrong in this, and that the fact was clearly proved and expressly found, then another question arises. In 1 Story's Equity Jurisprudence, § 146, this rule is laid down :—" It is not, however, sufficient in all

cases to give the party relief that the fact is material; but it must be such as he could not by reasonable diligence get knowledge of, when he was put upon inquiry. For, if by such reasonable diligence he could have obtained knowledge of the fact, equity will not relieve him; since that would be to encourage culpable negligence." These agents were put upon inquiry, for it was clearly their duty to know the character of the bonds they were signing, and to detect the mistake if there was one. A party will not be permitted to allege ignorance of the contents of his own deed. *Hamilton* v. *Nut*, 34 Conn., 501. Is the town an exception to this rule?

The slightest diligence would have disclosed the fact. It was only necessary to read the bond to discover the omission. A want of slight diligence in such matters is culpable negligence. The plaintiff then is in this dilemma,—if its agents read the bond they had knowledge of the mistake and issued the bonds understandingly, and that is fatal to the case; if they did not, they were guilty of culpable negligence, and that is equally fatal.

PARK, C. J. (dissenting.) I cannot concur in the result to which the majority of the court have come upon the question whether the plaintiff town exercised its optional right to make the bonds payable at the end of ten years. It is true the committee has found that "on the 25th day of February, 1880, the town gave notice by publication in various newspapers that the bonds would be paid at the office of the treasurer on the 1st day of April, 1880, and that interest upon them would cease at that time." But the committee has also found upon what action or attempted action of the town this finding is based, and if the premises do not warrant the conclusion, then the finding ceases to be a finding of fact. Let us examine the premises.

On the 7th day of October, 1878, the town passed the following vote:—"That the selectmen be, and they hereby are authorized (if in their judgment it seems advisable) to call in the bonds issued by the town amounting to forty-

eight thousand dollars, and to issue new bonds at a lower
rate of interest." At this time it could not be known
whether or not it would be for the interest of the town to
call in the bonds at the expiration of ten years. That
would depend upon the question whether or not new bonds
could be issued at a lower rate of interest, and therefore
the town merely authorized the selectmen, when the proper
time came, to exercise their best judgment in the matter.
The selectmen did nothing whatsoever in regard to the
bonds till the 3d day of February, 1880. The time was
now at hand when action must be taken to make the bonds
ten-year bonds, or they would become twenty-year bonds to
all intents and purposes. For a period of sixteen months
the selectmen had been unwilling to exercise the discre-
tionary power conferred upon them by the vote of the town
on the 7th day of October, 1878, and were still unwilling,
as clearly appears by their action, for they issued a call for a
town meeting to convene on the seventh day of the same
month to instruct them what to do in the matter. This as
clearly makes a refusal on their part to act under the vote
of 1878 as would a finding in express terms that they re-
fused to exercise the discretion at that time conferred upon
them. What can be clearer? After having ample power,
and ample opportunity to use it for so long a period, and
when at last there could be no further delay, we see the
selectmen calling upon the town to decide the matter and
give them particular instructions what to do. The town
formally gave them particular instructions at the meeting
which convened on the 7th day of February, 1880, as
requested, and formally directed them to issue new bonds
for the redemption of the old ones, at a rate of interest not
exceeding four and one half per cent. The town further
formally instructed them in relation to all the steps to be
taken in issuing the bonds, and in relation to the redemp-
tion and destruction of the old bonds. New bonds were
issued and the old bonds except those in controversy were
redeemed and destroyed in accordance with these formal
instructions of the town. Now can there be any doubt

Town of Essex *v.* Day.

under which vote of the town the selectmen acted in calling in the bonds? I think not. It was not enough that the selectmen had discretionary authority to call in the bonds by the vote of October, 1878. They must intentionally exercise the power in order to make the act the act of the town. The authority conferred involved judgment and responsibility. Would they exercise it after sixteen months delay, and after, as they supposed, the town had instructed them to call in the bonds? I think not.

But it appears that the warning for the meeting of the town on the 7th of February, 1880, was fatally defective in that but four days notice was given for the meeting, and consequently all the proceedings of that meeting were null and void. It was so held by this court in the recent case of *Brooklyn Trust Co.* v. *Town of Hebron*, 51 Conn., 22. But it clearly appears that the selectmen and the voters of the town supposed that the warning was sufficient and the meeting legal; consequently it had the same effect upon the selectmen as it would have had if it had been legal. The case cited had not then been decided. Indeed, it must be conceded that the selectmen acted under it in the issuing of the new bonds, and in the redemption and destruction of the old ones. They followed implicitly the supposed instructions of the town in all these transactions; and is it reasonable to conclude, that in calling in the bonds they exercised the discretion conferred sixteen months before, when the meeting of February 7th, 1880, virtually instructed them so to do? Is it likely that they made an exception in this particular, and followed all the other supposed instructions? I think not. Furthermore, if the warning of the meeting of February 7th, 1880, had been legal, the votes of the town at that meeting would have revoked the discretionary authority conferred by the vote of October 7th, 1878. The selectmen supposed that it was legal. Would they have intentionally exercised authority that they believed had been revoked, and that too when the revocation would relieve them from all responsibility in the matter? I think not.

I think therefore that the town never exercised its optional right of making the bonds payable at the expiration of ten years from their issue ; that this was not done by the vote of the town on the 7th day of October, 1878, for the reason that the selectmen never exercised the discretion therein conferred ; and that it was not done by the votes formally passed at the meeting on the 7th day of February, 1880, for the reason that all the proceedings of that meeting were null and void.

I think there is error in the judgment appealed from