Karl H. KERN et al., Plaintiffs,

v.

NCD INDUSTRIES, INC., a Delaware
corporation, Defendant.

Karl H. KERN et al., Plaintiffs,

v.

Harlan GROSSHANS et al., Defendants.

Court of Chancery of Delaware,
New Castle.

Aug. 10, 1973.

Reargument Denied Nov. 21, 1973.

Fischer Engineering & Maintenance Co., Inc.,[1] a firm doing business in the Republic of Korea[2] where it engages in construction and engineering projects in its status as a so-called invited contractor. By reason of such status it is permitted to bid on United States government construction contracts, a right denied to most alien firms doing business in Korea.

Such first cause of action initially seeks rescission of a purported stock purchase agreement executed by plaintiffs on December 5, 1971 under the terms of which the individual plaintiffs agreed to sell their stock in Femco to the defendant NCD Industries, Inc. in return for the issuance to them of nonnegotiable promissory notes in the gross amount of $500,000. At the time said shares were probably worth approximately $350,000. Alternatively, plaintiffs seek reformation of such agreement so as to have it comply with what plaintiffs contend was the parties' actual intention that plaintiffs' control of Femco would not be surrendered to NCD until their stock in Femco had been fully paid for.

In seeking such forms of relief, the complaint charges that false and fraudulent representations were made by the defendant Hochstadt in connection with the execution by the plaintiffs of the agreement in issue, namely, (a) that NCD was an existing corporation on the contract date when in fact it wasn't; (b) that NCD would not attempt to take control of Femco prior to full payment of the promissory notes purportedly issued for the purchase of all of the stock of Femco from plaintiffs; (c) that NCD would not undertake to alter or change the officers or directors of Femco until the notes were paid; and (d) that NCD would raise funds through a public issue of stock in the spring of 1972 for the purpose of paying off the promissory notes issued to plaintiffs.

The second cause of action is brought under the provisions of 8 Del.C. Section 225, and seeks an order determining who

H. Albert Young and Edward B. Maxwell, II of Young, Conaway, Stargatt & Taylor, Wilmington, for the individual plaintiffs.

E. Dickinson Griffenberg, Jr., of Potter, Anderson & Corroon, Wilmington, for the individual defendants and NCD Industries, Inc.

R. Franklin Balotti of Richards, Layton, & Finger, Wilmington, for Fischer Engineering & Maintenance Co., Inc.

MARVEL, Vice Chancellor:

The first of the above consolidated actions is brought on behalf of five individuals who claim to be the lawful holders of all of the outstanding shares of stock of their co-plaintiff and beneficial defendant,

---

1. Hereinafter referred to as Femco.

2. Hereinafter referred to as Korea.

are the lawful directors and officers of Femco and declaring that certain documents executed by those who plaintiffs claim are the properly elected officials of such corporation are valid. Plaintiffs contend that they were elected directors and officers of Femco at meetings held on April 18, 1972, while defendants argue that such elections were invalid inasmuch as the defendant NCD Industries, as of the date of such meetings, was allegedly the sole stockholder of Femco.

The concept of invited contractor status was developed in Korea as a result of the need of the United States armed forces for sophisticated buildings, the complexity of which was beyond the capacities of Korean engineering and contracting firms because of their inadequate equipment and skills.

Rental Guarantee Housing,[3] a type of government sponsored project which calls for the construction of housing for families of United States military personnel and the subsidizing by the government of payment for such a project by a guarantee of the payment of rentals over a fixed period is one of the special types of projects in which invited contractors participate.

On November 2, 1970, the award of such an RGH contract was made to the plaintiff Femco and its joint venture associate, the Korean firm of Sampoong Construction and Industrial Co., Ltd.[4] Such venturers agreed jointly to provide the required land and buildings and make all required improvements on the lands designated for such project at their own cost, thus assuming the burden of raising the capital required for the undertaking. The United States authorities, in turn, as noted above, were to guarantee the payment of rents based on an estimated 97% occupancy of the housing units in question over a 10 year period. Under the terms of the joint venture agreement, Sampoong was to provide the required land, its grading, and required retaining walls and the like while Femco was to finance the building opera-

tion as well as to build the housing units contracted for.

On September 8, 1970, the projected cost of the project in question was estimated to be approximately $9.4 million, allocated as follows: $7.9 million for the construction of 300 housing units in Seoul and $1.5 million for 70 additional units at Taegu. Based on such estimates, Femco estimated its expected profit in such project would be in the range of $1,000,000 over the 10 year period for which the United States had guaranteed rentals. Sampoong, for its part, was expected to make its profit on the transaction by acquiring title to the buildings and land involved on the expiration of the 10 year period. Under the terms of the joint venture agreement, plaintiff was to obtain financing in the amount of $5.5 million to apply to the project in question, and in its attempts to line up a loan for the project Femco ultimately entered into dealings with the defendants Harlan Grosshans and Albert M. Hochstadt, entrepreneurs who purported to have access to lending institutions.

In March 1971, the defendants Mr. Grosshans and Mr. Hochstadt met with the plaintiff Cesar Y. Catibayan, director and executive vice president of Femco, in Miami, Florida. As a result of such meeting an agreement was entered into providing that Femco would pay a finder's fee of 5% to Mr. Grosshans and 1½% to the Hamilton Group, a loan placement service in which Mr. Hochstadt held a 20% interest. However, unknown to Femco, Mr. Hochstadt was to receive half of the fees to be paid to the Hamilton Group.

While strenuous efforts were thereafter made during the ensuing months to raise the capital needed for the RGH project in question, the obtaining of such financing proved more difficult than anticipated. Neither the attempts of the defendants Grosshans and Hochstadt nor other efforts conducted independently of the latters' proved successful, institutions from which

3. Hereinafter referred to as RGH.

4. Hereinafter referred to as Sampoong.

loans were sought objecting for the most part to the length of the term of the proposed loan commitment. Objection was also made to the RGH contract in question, which failed to contain an absolute guarantee of repayment by the United States government of moneys advanced to finance the project in question.

Mr. Hochstadt's predictions on several occasions to the effect that the needed loans would shortly be approved were no doubt overly optimistic and were probably made to a large extent in order to keep the possibility of his earning a finder's fee alive. However, the Femco shareholders, apparently unable to get financing elsewhere, for a long time tolerated such delays and disappointments. However, in the light of Mr. Hochstadt's failure to come up with a definitive loan and due to the fact that much of the project was almost at a stage of readiness at which actual construction was ready to be undertaken but for the fact that necessary financing had not been obtained, Sampoong, in July or August, 1971, began looking for an independent loan source for the entire project. In October, 1971, it received a loan commitment from Overseas Limited for $8.5 million.

At this juncture, it must be noted, that over and above the immediate business of financing the RGH project in Korea, individuals interested in the basic transaction of the Korean RGH project here in issue were looking into plans for making Femco into what might be termed an RGH specialist, for the purpose of engaging in construction projects for the United States government on a worldwide basis, the first prospective projects being anticipated as taking place in Germany and Panama. However, plans for such proposed business expansion required a means of using the government's credit in order to obtain the necessary financing, and this could be done only by seeking amendments to the RGH contract so as to provide that rental income from the project could be used as security for contemplated borrowing. If

such amendments could be obtained for the Korean RGH project, such provisions could be used as a precedent for gaining an entrée to other overseas government housing projects. On the other hand, were financing for the Korean project to be furnished entirely from Sampoong's source, no contract modifications would be needed, and a precedent could not thereby be established for later housing projects.

Against the background of the financing difficulties facing Femco in reference to the Korean RGH project and with an eye towards expansion of the RGH business, the defendant Hochstadt and the plaintiff Catibayan entered into discussions over the possibility of the purchase of Femco by what ultimately became the defendant NCD Industries, Inc.

Pursuant to such discussions, in November 1971, the shareholders of Femco received a draft of a stock purchase agreement which basically provided for the sale of all of the issued and outstanding stock of Femco to NCD in return for promissory notes in stipulated amounts. When Hochstadt arrived in Korea in early December to negotiate the final agreement, there were a series of meetings on the proposed purchase and sale. The Femco shareholders had objections to certain provisions of the draft agreement and the final agreement, which was executed by plaintiffs on December 5, 1971, contained significant modifications not present in the original draft.

At the purported closing of the December 5, 1971 agreement, which was held on February 21, 1972, and at which Femco stock certificates were exchanged for promissory notes, ways and means of financing the Korean RGH project were still under discussion. Thus, while the Sampoong loan commitment from Overseas Limited had been apparently approved by the Korean Economic Planning Board, Mr. Hochstadt was nonetheless still attempting as late as March 15 to secure a loan of $8.-5 million for the entire project through the First Boston Corporation, as agent. How-

ever, without Mr. Hochstadt's knowledge and prior to a meeting with Sampoong's representatives for the purpose of reviewing the possibility of substituting a loan from First Boston for that of Sampoong (a step which threatened to deprive Mr. Hochstadt of his finder's commission), Femco, on March 24, 1972, had caused an amendment to the original joint venture agreement to be executed which transferred the right to obtain RGH financing from Femco to Sampoong. And while Hochstadt continued to stress the advantages of using his loan sources, the Sampoong representatives, so as not to jeopardize their own loan source until First Boston had produced a definitely more advantageous loan, refused to reveal any significant details about their own source of funds. When Mr. Hochstadt attempted to apply pressure on the Sampoong representatives, they took the position that Hochstadt had exceeded his authority as a finder. Mr. Hochstadt then asserted that he was both a financial consultant to Femco as well as a representative of NCD, which he claimed was the equitable owner of all of the stock of Femco. Consequently, after it became clear that plaintiffs would not stand behind Mr. Hochstadt, he sought to force the result he wanted by taking the position that NCD controlled Femco and causing NCD purportedly to remove the incumbent Femco directors from office.

■ I turn first to plaintiffs' contention that prior to execution of the December 5, 1971 contract by plaintiffs, representations were made to them by the defendant Hochstadt that NCD as of such date was a duly organized corporation when in point of fact the incorporation of such enterprise was not accomplished until December 20, 1971. It is also claimed that similar representations were made in certain documents exhibited to plaintiffs before they executed the December 5, 1971 contract. They accordingly contend that such purported contract is void as having been entered into at a time when NCD was non-existent. Assuming but not deciding that plaintiffs

were in fact misled as to the actual date of NCD's incorporation, a doubtful assumption in light of Femco's own minutes which refer to the expected future execution of a document of purchase by NCD, the point is that the defendant Hochstadt made it clear at the time of plaintiffs' signing of the document that he was not authorized to execute it and that it must be returned to the United States for approval and execution by NCD. The latter having been incorporated on December 20, 1971, Mr. Levy, as president of the corporation, executed the document the following day. In short, plaintiffs, by entering into the agreement in issue on December 5, 1971, in essence made an offer which was accepted by NCD on December 21, 1971. I therefore reject plaintiffs' contention that the contract in issue is void for the reason that NCD was not in existence on December 5, 1971.

The sections of the December 5, 1971 contract which are relevant to the issues to be decided at this juncture read as follows. The portions in italics were added after plaintiffs objected to the original draft.

"Section 1.1 Transfer of FEMCO Capital Stock. Subject to the terms and conditions of this Agreement each Stockholder will sell, transfer and deliver to NCD, at the Closing on the Closing Date, all issued and outstanding shares of capital stock of FEMCO by delivery to NCD of certificates representing all of such shares in form ready for transfer and duly endorsed in black with signatures guaranteed. *All such shares shall be held in Escrow by NCD Counsel. Upon proof that payment of principal and interest has been made to each holder of NCD's 8% non-negotiable promissory note NCD's counsel shall release the FEMCO shares of each stockholder so held to the Treasurer of NCD. . . .*"

"Section 1.2 Consideration for Transfer to NCD. On the closing Date, NCD will, in full payment for the issued and

outstanding capital stock of FEMCO, deliver to the Stockholders its 8% non-negotiable promissory notes . . . . Each promissory note shall be due on the earlier of (i) one year from the Closing Date, or (ii) 30 days after the closing of a public offering pursuant to a registration statement to be filed with the Securities and Exchange Commission, and may be prepaid without penalty at any time . . . All present FEMCO management personnel will agree in writing to be employed in executive positions for one year following the Closing at no less than their present salaries. *NCD may not terminate any present FEMCO management personnel until the Stockholders' promissory note is paid in full."*

"Section 2.1 The Closing and the Closing Date. The time of the delivery by the Stockholders of their respective shares of capital stock of FEMCO, as provided in Section 1.1 of this Agreement, and the delivery by NCD of its promissory notes, as provided in paragraph (a) of Section 1.2 of this Agreement, is herein called the 'Closing Date' . . . ."

"Section 3.1 Representations and Warranties by the Stockholders and FEMCO. . . ."

"(s) Conduct until Closing. Femco will from the date hereof until the Closing Date (i) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its corporate existence, rights, licenses and permits; continue to operate its business substantially as presently operated . . . (ii) comply with all applicable laws and regulations . . . . and take all necessary action to obtain, preserve, renew and keep in full force and effect all licenses and permits which may be required for the operation of its business and insurance policies of the same type and coverage as presently in effect."

"Section 4.1 Actions of the Stockholders and FEMCO Pending Closing. The Stockholders and FEMCO covenant and agree with NCD as follows:

(b) Operations Pending Closing . . . . until the Closing provided for in this Agreement, FEMCO will: conduct its affairs and business only in the ordinary course of business; refrain from creating or incurring any liabilities other than current liabilities incurred in the ordinary course of business; refrain from making or becoming a party to any contract or commitment, or renewing, extending, amending or modifying any contract or commitment, except in the ordinary course of business; refrain from making any capital expenditures except for ordinary repairs and replacement; refrain from entering into any contract or commitment, except in the ordinary course of business maintain its assets and properties in good condition and repair not sell or otherwise dispose of any of its assets or properties, except sales out of inventory in the ordinary course of business . . . . ."

"Section 5.2 Conditions Precedent to Obligations of the Stockholders. . . . .

(c) *Until NCD complies with its obligations set forth in section 1.2, NCD agrees that it will not take any action to alter the Directors of FEMCO.*

(d) *NCD Counsel shall agree in writing that he will serve as escrow agent and further that no shares will be released pursuant to section 1.2 unless the payment conditions contained therein have first been complied with.*

(e) *Until NCD complies with its obligations set forth in section 1.2 the Directors of FEMCO agree that they will continue the conduct of* FEMCO *as contained in Section 3.1(s)."*

NCD contends that it in effect acquired control of Femco pursuant to the terms of the December 5, 1971 contract by reason of

having delivered promissory notes in return for plaintiffs' stock and seeks Court approval of the purported removal of plaintiffs, as Femco directors. Plaintiffs on the other hand, contend that the parties' actual agreement was to the effect that control of Femco was not to pass to NCD until the promissory notes were paid in full and that the agreed on terms were somehow altered prior to execution by plaintiffs of a final draft of agreement on December 5, 1971, which, by cross reference, provides that effective control of Femco would pass to NCD upon mere delivery of the promissory notes in question.

Plaintiffs, as noted above, seek rescission of such contract, or, alternatively, its reformation so as to have it express the alleged actual intent of the parties, namely that effective control of Femco was not to pass from plaintiffs until the notes were paid. According to the present record, such notes remained unpaid as of the conclusion of trial.

■ Both sides agree that the restriction on the release of the shares from escrow was intended to terminate when the promissory notes were paid. NCD argues, however, as noted above, that ownership of the shares, including the right to vote them, passed on their mere delivery to the escrow agent, the purpose of such escrow being to prevent NCD from transferring the shares to a third party prior to their being paid for. However, the proposed arrangement for an escrow deposit and suggested provisions that NCD neither terminate incumbent Femco management, nor alter the Femco directors until the promissory notes in issue were actually paid, were suggested by plaintiffs as modifications to the draft agreement which plaintiffs had found unsatisfactory. The proposed modifications to be worked into the final draft of agreement evidence, in my opinion, an intent of the parties to make payment of the promissory notes a basic ingredient of the parties' agreement, and while the testimony is to the effect that all plaintiffs read the final draft of agreement and were given copies, the use of numbered paragraphs containing decimals, which were used in cross references, and the pressure applied by Mr. Hochstadt to obtain all required signatures at once notwithstanding a request that Hawaiian counsel be given an opportunity to review the contract, in my opinion, caused plaintiffs to sign the final draft of agreement without appreciating the effect of the wrongly inserted cross reference on the meaning of the contract. Thus, I am satisfied that Section 5.-2(c), (d) and (e) of the final draft of agreement erroneously contains a cross reference to Section 1.2 rather than to Section 1.1, and that the agreement as written thus fails to express the actual intention of the parties, namely that full payment for plaintiffs' stock was to be a prerequisite to the coming into being of NCD's right to take over control of Femco. Significantly, Sections 3.1 and 4.1 bound Femco to operate its business normally as presently operated until closing. Plaintiffs contend that the wrong cross reference above alluded to was fraudulently or negligently inserted when the final draft of contract was prepared.

■ Fraud is the misrepresentation or concealment of a material fact and when proved calls for rescission of a thus tainted contract, Holley v. Jackson, 39 Del.Ch. 32, 158 A.2d 803. The conduct relied on in the present case for the granting of rescission is the alleged improper action of Mr. Hochstadt in allegedly causing the cross reference number in paragraphs (c), (d) and (e) of Section 5.2 of the December 5, 1971 contract to refer to Section 1.2 instead of what was intended by the parties, namely Section 1.1. However, the evidence on this point is as consistent with mistake or silence as with positive fraud. In short, I am satisfied that plaintiffs have not established by the preponderance of the evidence the existence of active fraud or the like on the part of the defendant Hochstadt and that rescission should not be granted. In other words, the mere fact

that it was in Mr. Hochstadt's interest for him to take steps to preserve his right to a generous finder's fee, does not mean that he must be presumed to have fraudulently juggled the cross references to be inserted in the December 5, 1971 contract in order to preserve such right.

However, I am satisfied (although the result is anomalous) that on the present record plaintiffs have established a right to reformation despite the fact that the granting of such form of relief requires a strong showing. I say this because I am satisfied on the basis of all of the relevant facts of record and a realistic consideration of what the individual parties present (none of whom was an attorney) were actually bargaining for was an actual sale in which plaintiffs would receive cash and not merely promises to pay. I accordingly conclude that the insertion of the cross reference of Section 1.2 instead of Section 1.1 in the relevant subsections of Section 5.2 of the December 5, 1971 contract, alluded to above, resulted either from mutual mistake of the parties or mistake on the part of plaintiffs and eventual knowledge of such mistake on the part of the defendant Hochstadt followed by silence. See Colvocoresses v. W. S. Wasserman Co., 26 Del.Ch. 333, 28 A.2d 588, in which the Chancellor ruled:

> "The right (of reformation) may be exercised in a clear case when the alleged mistake, sought to be corrected, relates either to the contents of the instrument, or to the real meaning of the language used. 5 Pom.Eq.Jur. (2d Ed.) Sec. 2096. In the absence of some element of fraud, such a mistake must be mutual and common to both parties; a mere unilateral mistake is not within that rule. Home Life Ins. Co. v. McCarns, supra; 5 Pom.Eq.Jur. (2d Ed.) Sec. 2097. It, necessarily, follows that a clear mistake by one party, coupled with ignorance thereof by the other party, is not a mutual mistake, and will not be corrected. Home Life Ins. Co. v. McCarns, supra. But when the mistake of one party, with respect to the meaning of some material provision of the signed contract, is accompanied not only by the other party's knowledge thereof, but, also, by his silence, it is said to be equivalent to a mutual mistake (Williston on Contracts (Rev.Ed.) 1548; 5 Pom.Eq. Jur. (2d Ed.) § 2097, note; 3 Pom.Eq. Jur. (5th Ed.) § 870, A); at any rate, while not strictly a mutual mistake, equity will reform the instrument. Weightman v. Weightman, 342 Pa. 8, 20 A.2d 215; Town of Essex v. Day, 52 Conn. 483, 1 A. 620."

See also earlier opinion in the same case, 24 Del.Ch. 53, 4 A.2d 800. The agreement executed by plaintiffs as of December 5, 1971 will be reformed as prayed for by plaintiffs.

Based on the above conclusions, Karl H. Kern, George F. Krause, Cesar Y. Catibayan, Henry Dela Cruz and Donald F. Fischer are declared to be the stockholders of Fischer Engineering & Maintenance Co., Inc., while the following are the duly elected officers and directors of such corporation, namely George F. Krause, president and director, Cesar Y. Catibayan, executive vice president and director, Oliver A. Lim, treasurer and director, Karl H. Kern, secretary and director, and Henry Dela Cruz, director.

It necessarily follows that such directors and officers were authorized to act with respect to the supplemental joint venture agreement of March 24, 1972 as well as the assignment of proceeds. Finally, in light of the above, I am of the opinion that NCD did not have the right to remove Femco directors for cause not having paid for the Femco stock in question.

Order on notice.

## ON REARGUMENT

In their motion for reargument in the above case, defendants seek post-trial relief, which, if granted, would provide for the inclusion of a provision in the order to be entered on the Court's opinion of Au-

gust 10, 1973 extending defendants' time for performance of the December 5, 1971 contract in issue, an agreement having to do with the proposed purchase of Femco stock by NCD for the stipulated sum of $500,000.

In its August 10, 1973 opinion, this Court, while denying plaintiffs' application for rescission, granted their prayers for reformation of the December 5, 1971 agreement, which, as reformed, was read to hold that the actual intent of the contracting[1] parties was that plaintiffs were to be paid for their stock as a prerequisite to NCD's right to take over control of Femco. The provision now sought to be incorporated in the final order on such opinion would, if allowed, grant defendants eight months from the date of the entry of such final order within which to pay the promissory notes here in issue which fell due on January 1, 1973. At the stipulated time, defendants neither caused such notes to be paid nor tendered payment. At trial, NCD's president testified that NCD had had no intention of paying the notes in issue on their due date for reasons other than the pendency of this action.

Defendants now contend that payment of the notes in issue or tender of payment for them was not required of them on January 1, 1973, despite the terms of such notes, because, by bringing this action, plaintiffs allegedly made it impossible for defendants to meet their required performance under the contract here in issue by preventing the latter from raising the funds required to pay off the notes in issue through a public offering, or otherwise placing themselves in a position to pay such notes on their due date. Thus, it is argued, accepted equitable principles require that plaintiffs not be permitted to gain a de facto rescission of the parties' contract from what defendants term plaintiffs' own wrongdoing and thereby gain indirectly a form of relief denied them in the Court's August 10, 1973 opinion.

Defendants also seek clarification of those parts of the Court's August 10, 1973 opinion in which it was found in effect that a basic ingredient of the parties' agreement was that plaintiffs were in effect to retain their Femco stock until it was paid for, an event which failed to come to pass.

Passing over plaintiffs' basic contention, namely that the question of their right to have their Femco stock in issue returned to them from escrow has become moot because of defendants' default in payment of its notes, I shall turn to defendants' contentions on reargument.

In support of their motion defendants argue that because plaintiffs have been granted reformation of the contract in issue that defendants are equitably entitled to have their own interests protected as a condition precedent to the granting of the equitable relief accorded plaintiffs. Compare Toucey v. New York Life Insurance Co. (CA8) 102 F.2d 16, McFarland v. Gregory (CA2) 322 F.2d 737, and Gulf Oil Corp. v. American Louisiana Pipeline Co. (CA6) 282 F.2d 401.

However, in my opinion, defendants are confusing situations in which a party equitably entitled to relief has been prevented from timely performance by reason of dilatory or evasive tactics on the part of his adversary with unjustified non-performance. Here plaintiffs by filing suit were simply attempting to establish their claimed rights to recover or protect their Femco stock either on the basis of fraud or mutual mistake.

■ In any event, having failed to have plaintiffs' complaint dismissed and the relief prayed for denied, defendants may not, in my opinion, at this late stage in the proceedings, seek to raise by their present motion an issue which they should have raised at trial, namely defendants' claimed right not to be required either to pay for the Femco stock here in issue on January 1,

---

1. See Catibayan testimony at page 262 of the trial transcript.

1973 or to make tender of payment for such stock. Compare *Miller v. Hob Tea Room*, 31 Del.Ch. 404, 75 A.2d 577.

Finally, having reached the basic decision that the intent of the contracting parties was that full payment for plaintiffs' stock was to be a prerequisite to NCD right to take over control of Femco and that payment of the promissory notes was a basic ingredient in the parties' improperly expressed meeting of minds, any other sections of the contract in issue at odds with what I have found to have been the parties' actual intent are either redundant or deemed reformed to conform with such intent. The relief sought in defendants' motion for reargument is denied.

Order on notice.