[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE COUNTERCLAIM (No. 137)
In early August 1994, the parties to this case executed a contract in which the defendant, Shawmut Bank Connecticut N.A. (the "Bank")[1], agreed to sell real property containing a restaurant[2] in Cheshire (the "Property") to the plaintiff, Demetrius P. Traggis, Trustee ("Traggis")[3]. The contract provides that the closing of title shall occur on "August 15, 1995." The question presented by the portion of this case now before the Court is whether the closing date just quoted is a scrivener's error that should be judicially reformed to state "August 15, 1994." For the reasons set forth below, the answer to this question is in the affirmative.
It will be helpful to describe the procedural posture of the case at the outset. Traggis commenced this case by service of process on June 6, 1995. He is the sole plaintiff, and the Bank is the sole defendant. (Traggis's allegations against another defendant have been withdrawn.) Traggis's amended complaint alleges that "[o]n or about March 31, 1995, while the [contract] was in effect," the Bank breached the contract by selling the Property to a third party. CT Page 1691
The Bank, in response, has filed a counterclaim claiming that the contract "was executed as the result of mutual mistake, or mistake of the [Bank] coupled with actual or constructive fraud or inequitable conduct on the part of the plaintiff." The counterclaim seeks "a reformation of the contract so that it will conform with the actual agreement of the parties and state the date of the closing as August 15, 1994."
Traggis, in turn, has filed two special defenses to the counterclaim. The first special defense is that, "The defendant is estopped from claiming a reformation of the contract because said defendant previously sold the property recited in said contract, and has made it impossible to reform the contract." The second special defense is that, "The defendant is guilty of laches because it sold the property known as 200 South Main Street, Cheshire, CT., to a third party on March 31, 1998."
By agreement of the parties, the counterclaim was tried to the Court prior to any hearing of the allegations contained in Traggis's complaint. The evidentiary hearing on the counterclaim occurred on December 6-7, 2000. Following the submission of posttrial briefs, the case was argued on January 30, 2001.
It is well established that the standard of proof in reformation cases is "clear, substantial and convincing evidence." Lopinto v. Haines,185 Conn. 527, 534, 441 A.2d 151 (1981). After a careful review of all of the evidence, the following facts are found in accordance with that standard.
In April 1993, the Bank listed the Property for sale with Timothy J. Kennelly, Jr. ("Kennelly"), who did business as Kennelly Realty. Kennelly subsequently showed the Property to Traggis. On July 12, 1993, Traggis signed a pre-printed short form agreement with Kennelly. This agreement stated that Traggis would purchase the Property for $650,000. The agreement stated the closing date to be "September 12, 1993 or PZ approval which one is later."
The Bank subsequently referred the matter to its attorney, Marshall Goldberg, of the Stamford law firm of Wofsey, Rosen, Kweskin 
Kuriansky. Goldberg drafted a more comprehensive contract, with significantly different terms, which the parties executed on or about August 27, 1993. This contract stated that the purchase price was to be $575,000, with $28,750 to be paid at the time of execution and the remainder to be paid at the time of closing. The closing date was stated to be "on the later to occur of December 15, 1993 or Town of Cheshire approval of Purchaser's intended addition to the premises . . . or on such other date as may be mutually agreed upon by the parties hereto." These terms were terms demanded by the Bank and agreed to by Traggis. The CT Page 1692 parties subsequently agreed upon a number of extensions for the closing date. The last of these extensions was to May 31, 1994. That date came and went without a closing, and the August 27, 1993 contract became an historical relic.
On June 23, 1994, Traggis and his business partner, Gordon Bilides, signed a second pre-printed short form agreement for the purchase of the Property. This agreement stated the purchase price to be $450,000, of which the sum of $28,750 already held by the Bank was to be the initial deposit. (The new purchase price resulted from an appraisal of the Property, valuing it at $450,000, done on January 3, 1994.) The June 23, 1994 agreement contained a third party financing contingency, providing that if Traggis and Bilides were unable to secure a commitment for mortgage financing in the amount of $450,000 within 60 days and timely notified the Bank of such inability the agreement would become null and void and the deposit returned to Traggis. The closing date was stated to be August 26, 1994.
The stage was now set for the drafting of the contract at issue in this case. All of the negotiations in this case were between Traggis and Kennelly. No employee or attorney of the Bank ever spoke directly with Traggis. After Traggis and Bilides signed the second short form agreement just described, Kennelly submitted that agreement to the Bank. The Bank, in turn, once again submitted the matter to Attorney Goldberg for the drafting of a new contract. The Bank informed Goldberg that it wanted the closing to occur in two weeks.
At trial, Attorney Goldberg candidly admitted that he was responsible for a mistake in the drafting of the new contract. On or about July 29, 1994, he marked up a copy of the August 27, 1993 contract and gave it to his secretary so that she might type up a new contract. Goldberg told his secretary that the closing date on the new contract was to be "the 15th," by which he meant August 15, 1994. The secretary, however, typed in "August 15, 1995." Goldberg failed to notice the mistake.
The contract, as thus typed, had the following relevant provisions. The contract is stated to be "made as of the day of August, 1994," with the space preceding the word "day" left blank. The purchase price is stated to be $450,000, consisting of a deposit of $28,750 and $421,250 due at the time of closing. The closing was stated to be "on August 15, 1995 . . . or on such other date as may be mutually agreed upon by the parties hereto." The contract also states that, "It is understood and agreed that this written Agreement . . . constitutes the entire contract between the parties hereto, and that no oral statements or promises, and no understanding not embodied in this writing, shall be valid or binding." The contract additionally states that it "is conditioned upon the CT Page 1693 Purchaser executing and delivering [it] together with the down-payment to the Seller's Attorneys on or before August 10, 1994 at 5:00 P.M., time being of the essence." The contract contains no mortgage contingency provision.
Goldberg sent the typed contract to Kennelly on July 29, 1994. On that same date, Kennelly gave the contract to Traggis for signing. Kennelly told Traggis that the reason for the Bank's acceptance of the $450,000 price was the fact that there would be a quick closing in two weeks. Traggis replied, "ok." Traggis then took the contract and subsequently reviewed it with Bilides.
On August 8, 1994, Bilides returned the contract, now bearing Traggis's signature, to Kennelly. Kennelly said that he had to get the contract to the Bank for its signature because there was only a week left before the closing. Bilides replied, "fine."
On August 9, 1994, the contract was signed for the Bank by Peter F. Murtagh, a vice president of the Bank. Murtagh did not notice the closing date specified in the typed contract at the time of his signature. Kennelly gave a copy of the signed contract to Traggis. Kennelly said, "We're all set for next week."
At trial, Traggis and Bilides denied that the conversations with Kennelly just described had occurred. Their testimony on this point was not credible.
August 15, 1994 came and went without a closing. On August 16, 1994, Kennelly asked Traggis why he had not closed. Traggis replied that his financing was not in order but that he had another year to close.
Kennelly, who still had the listing, told Traggis that Traggis could purchase the Property until Kennelly had another offer. Traggis replied that he would have to take his chances because he had no financing.
Traggis was represented in this matter by Fred Hitt, a Cheshire attorney. At the end of September or early October, Goldberg talked with Hitt. Goldberg told Hitt that the August 15, 1995 closing date typed in the contract had been a mistake. Hitt replied, "I know it's a mistake, but it's the only weapon I have."
On October 14, 1994, Goldberg sent Hitt a letter stating that the Bank would tender a deed to the Property at a closing to be held on October 27, 1994. In the event that Traggis did not close, the Bank would pursue its default remedies under the contract. The letter describes the August 15, 1995 closing date in the contract as "a typographical error." CT Page 1694
On October 18, 1994, Hilt sent Goldberg a letter in reply. Hitt's letter states that Traggis is still working on his financing. The letter concludes that, "Unless and until the Seller is willing to sign a new Agreement with a reasonable closing date, the Purchaser will hold the Bank to the closing date as provided in Paragraph 12 of the Agreement, namely on or before August 15, 1995."
On October 19, 1994, Goldberg sent Hitt a letter in reply. This letter states that the Bank "will expect a closing on the date announced, i.e., October 27, 1994."
October 27, 1994 came and went without a closing. Following that date, Kennelly and the Bank commenced efforts to sell the Property to another buyer. As mentioned, the Bank sold the Property to a third party in March 1995, and Traggis commenced this action by service of process in June 1995.
The issue presented is whether the August 1994 contract should be reformed to change the closing date of "August 15, 1995," which appears in the typed instrument, to "August 15, 1994."
The standards governing a cause of action for reformation of a contract are well established.
 A cause of action for reformation of a contract rests on the equitable theory that the instrument sought to be reformed does not conform to the real contract agreed upon and does not express the intention of the parties and that it was executed as the result of mutual mistake, or mistake of one party coupled with actual or constructive fraud, or inequitable conduct on the part of the other.
Lopinto v. Haines, supra, 185 Conn. at 531. (Internal quotation marks and citations omitted.) There are thus three possible factual bases for the reformation of contracts: (1) mutual mistake; (2) unilateral mistake on one side coupled with fraud on the other; and (3) unilateral mistake on one side coupled with inequitable conduct on the other. The facts of the present case must now be considered with respect to these different possibilities.
(1) Mutual mistake. This is the classic occasion for the reformation of contracts. Spirt v. Albert, 109 Conn. 292, 146 A. 717 (1929), is a good example. Spirt and Albert agreed on the sale and purchase of real property. Their negotiations were conducted in what the opinion quaintly CT Page 1695 refers to as "the Jewish language" in the presence of an attorney who apparently spoke only English. Id. at 297. When the attorney subsequently drafted the deed he failed to include certain easements that the parties had, in fact, agreed upon. Spirt holds, unexceptionally, that the instrument may be reformed to reflect the actual agreement of the parties.
Spirt is a case of an agreement that is actually concluded prior to the drafting of the instrument sought to be reformed. The reformation is not of the contract itself, but of the instrument which inaccurately reflects the contract. That process is not possible here. There is no evidence that Traggis and the Bank had agreed on a closing date of August 15, 1994 prior to the drafting of the instrument sought to be reformed. Rather, the instrument was prepared as the Bank's offer, which Traggis accepted by signing. Moreover, while there is some authority for the reformation of a contract on the ground of mutual mistake where no previous agreement by the parties existed; see Corticelli Silk Co. v. Slosberg, 101 Conn. 44,124 A. 818 (1924); there was no mutual mistake here. The Bank agrees with this analysis. The evidence establishes that, while the Bank failed to read the instrument carefully prior to signing it, and was, consequently, mistaken as to its contents, Traggis was laboring under no such disability. He signed the instrument only after reading it and becoming well aware of its contents.
(2) Unilateral mistake on one side coupled with fraud on the other. AsLopinto v. Haines explains, this category can involve either actual or constructive fraud.
Kilmer v. Smith, 77 N.Y. 226 (1879), provides a good example of actual fraud. Smith sold real property to Kilmer. Without Kilmer's knowledge or consent, Smith put language in the deed making Kilmer responsible for mortgages that Kilmer had never agreed to assume. While Kilmer was misled as to the language of the deed, Smith knew exactly what he was doing. This was a case of unilateral mistake on Kilmer's part and actual fraud on Smith's part. The instrument was, appropriately, judicially reformed.
Home Owners' Loan Corp. v. Stevens, 120 Conn. 6, 179 A. 330 (1935), provides an illustration of constructive fraud. Stevens had agreed to accept $3,950 from a bank in exchange for the release of a mortgage. The bank's clerk mistakenly prepared a closing statement authorizing a payment in the amount of $4,849. When the bank's lawyer asked Stevens at the closing whether this figure was correct, he replied that it was. This was a case of unilateral mistake on the bank's part and constructive fraud on Stevens' part. Id. at 15. (Although Stevens' affirmative response to the lawyer's question came pretty close to actual fraud, the opinion finds that "no actual fraud was shown." Id.) The statement was, CT Page 1696 appropriately, reformed.
No actual or constructive fraud appears from the facts of the present case. What Traggis did here was to sign a contract prepared by the Bank's attorney and given to him by Kennelly, the Bank's agent. While Traggis should have realized that something was amiss (a point that shall be discussed in a minute), he did nothing fraudulent to mislead the Bank as to the contents of its own document. "[A]s a general rule mere nondisclosure of a fact does not amount to fraud." Watertown Savings Bankv. Mattoon, 78 Conn. 388, 393, 62 A. 622 (1905). See Olson v. AccessoryControls Equipment Corp., 254 Conn. 145, 180, 757 A.2d 14 (2000), and authorities cited therein.
Moreover, the fraud cases just discussed, in company with mutual mistake cases, involve instruments that inadequately reflect prior agreements between the parties. "In a case of mutual mistake, the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement. . . . In a case of fraud, the parties have reached agreement and, unknown to one party but known to the other (who has misled the first), the subsequent writing does not properly express that agreement." Chimart Associates v. Paul, 489 N.E.2d 231, 234
(N.Y. 1986). In either case, courts can straightforwardly reform the instruments to reflect the prior agreements. As mentioned, that cannot be done here because there was no pre-instrument agreement on an August 15, 1994 closing date between Traggis and the Bank.
(3) Unilateral mistake on one side coupled with inequitable conduct on the other. Equity is a flexible doctrine. The fraud cases just discussed are a species of a somewhat more comprehensive group of reformation cases involving defendants who have engaged in inequitable conduct. These are cases "in which it would be unconscionable that a party to an agreement should be able to insist that another party should be bound by its precise terms and should not be entitled to rectification in accordance with his actual intention in executing it." I.C.F. SPRY, THE PRINCIPLES OF EQUITABLE REMEDIES 613 (5th ed. 1997).
Town of Essex v. Day, 52 Conn. 483, 1 A. 620 (1885), provides a useful example of this doctrine. The Town of Essex approved a resolution calling for the issue of bonds payable in ten years. Because of a printer's error, the text of the bonds actually issued stated that they were payable in twenty years. The town treasurer signed the bonds supposing incorrectly that they were payable in ten years. He sold the bonds to one Tiffany stating that they were so payable. Tiffany subsequently sold the bonds to one Swan. Swan had also been told by the town treasurer that the bonds were payable in ten years. Swan then sold the bonds to Day. Day had full knowledge of the Town's original resolution at the time of his CT Page 1697 purchase. When, at the expiration of ten years, the Town called in the bonds, Day declined to surrender his bonds and instead demanded the continuing payment of interest. On these facts, the Supreme Court held that the bonds could be judicially reformed. The Court explained that the equitable powers of the judiciary in reformation cases are not limited to cases of fraud.
 A grantor by mistake embraces in his deed a parcel of land that neither party intended to have conveyed. The grantee sees his mistake, but does not call the attention of the grantor to it, and afterwards claims the parcel thus accidentally conveyed. or a person offers a reward of $100 for the detection and arrest of a burglar, but by mistake and without his notice it is printed $1,000. A man who knows of the mistake arrests the burglar and claims the $1,000. In each of these cases the error is not mutual, but wholly on the one side. What is there on the other? Not mistake, but fraud. That fraud can never stand for a moment in the court of equity. But suppose the case to be one where, instead of actual fraud, there is merely such knowledge, actual or imputed by the law, as makes it inequitable for the purchaser to retain his advantage. The court will deal as summarily with that inequitable position of the party, as in the other case with his fraud.
Id. at 496.
Day is much closer to the facts of this case. There is a unilateral mistake on one side — the printer's error unnoticed by the Town in Day corresponds to the attorney's error unnoticed by the Bank in this case. And in Day, like the present case, the other side has acted inequitably. In Day, the bondholder's inequitable behavior consisted of his demand of the benefit of the contract (in that case the twenty-year expiration date) in spite of his knowledge from the beginning that the benefit was created by a typographical error. The same is true here. Traggis's inequitable behavior consists of his demand of the benefit of the contract (in this case the 1995 closing date) in spite of his
knowledge from the beginning that the benefit in question was created by a typographical error.
Traggis's knowledge of the mistake is well established by the evidence. As described above, Kennelly told Traggis on July 29, 1994 — the date that Kennelly gave the contract to Traggis for signing — that the reason for the Bank's acceptance of the $450,000 price CT Page 1698 was the fact that there would be a quick closing in two weeks, and Traggis replied, "ok." In addition, on or about August 9, 1994, when Kennelly gave a copy of the signed contract to Traggis, Kennelly said, "We're all set for next week." Moreover, beyond these statements, any reasonable person in Traggis's position would have known that the August 15, 1995 closing date in the typed instrument must have been a mistake. The pattern in the protracted negotiations between Traggis, Kennelly and the Bank had been to keep the closing date within a fairly short time of the executed agreement. For example, the closing date in the June 23, 1994 short form agreement was August 26, 1994. The August 1994 contract itself, as described above, required Traggis to deliver the down payment to the Bank's attorneys by August 10, 1994. Given these facts, a closing date of late summer or early fall 1994 might have been plausible. A closing date of August 15, 1995 was not. Traggis, who had previous experience in the restaurant business, must have known that the setting of a closing date more than a year in advance in a setting like this, would be, to say the least, an unusual event. The unusual nature of the stated closing date should have prompted at least some brief inquiry on Traggis's part. It did not. The reason for Traggis's silence at the time is captured in the later statement of his attorney, Fred Hitt: "I know it's a mistake, but it's the only weapon I have."
Day is important not only because of its thematic resemblance to the present case but also because it establishes that, in appropriate cases, reformation can occur in spite of the fact that there is no agreement of the parties which predates the written instrument sought to be reformed. Recall that in Spirt and Stevens, reformation was essentially a matter of correcting a written instrument to reflect a prior oral agreement reached by the parties. That cannot be done here, at least not so easily. The evidence does not, establish that Traggis and the Bank sat down and orally agreed upon an August 15, 1994 closing date prior to the typing of the contract sought to be reformed. The evidence instead shows that the Bank had decided upon an August 15, 1994 closing date prior to the typing, but Traggis was unaware of the anticipated closing date until Kennelly handed him the contract to sign. But because, for reasons already discussed, Traggis must have known that the instrument was mistaken when he signed it, reformation can nevertheless occur.
This was the situation in Day. The bondholder in Day never sat down with the Town prior to the printing of the bonds to orally agree upon an expiration date for the bonds. Rather, the bondholder's understanding came at the time that he acquired the bonds, long after the bonds had been printed. But because the bondholder acted inequitably in claiming the benefit of a contract provision that he knew to be a mistake, reformation nevertheless occurred. As Professor Corbin states, "It is certain that such a bad actor will not be permitted to enforce the CT Page 1699 agreement according to its words." 3 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 610 at 696 (1960). See Beatty v. Donahue, 249 S.W.2d 33,34-35 (Ky. 1952). Equitable relief is appropriate in such cases, and the technique of reformation serves to accomplish the appropriate result. See 3 GEORGE E. PALMER, THE LAW OF RESTITUTION § 13.9 at 56 (1978).
For the reasons discussed above, the evidence in this case makes reformation appropriate. It is now necessary to turn to Traggis's special defenses.
As mentioned, Traggis's first special defense is that, "The defendant is estopped from claiming a reformation of the contract because said defendant previously sold the property recited in said contract, and has made it impossible to reform the contract." Traggis has failed to brief this special defense, and it is deemed abandoned. Even if the defense were claimed, it would be unpersuasive on the facts found here. It is eminently possible to reform the instrument in question to state an August 15, 1994 closing date, and the Bank's subsequent sale of the Property does not in the least stand in the way. The purpose of the reformation sought here is to prevent a party — in this case, Traggis — from acting inequitably. That purpose can be accomplished here. In doing so, no harm will be done to the third party that has subsequently purchased the Property.
Traggis's second special defense is that, "The defendant is guilty of laches because it sold the property known as 200 South Main Street, Cheshire, CT., to a third party on March 31, 1998." The evidence establishes that the Bank sold the property to a third party on or about March 31, 1995. This action did not, however, constitute laches.
"Laches consists of two elements. First, there must have been a delay that was I inexcusable, and, second, that delay must have prejudiced the defendant." Kurzatkowski v. Kurzatkowski, 142 Conn. 680, 684-85,116 A.2d 906 (1955). The delay referred to is a delay in asserting the reformation claim. The sale of the Property to a third party does not constitute delay for purposes of the doctrine of laches. The analysis would be different if a belated assertion of the reformation claim was "done against the intervening rights of others acquired in good faith."New Orleans Canal Banking Co. v. Montgomery, 95 U.S. 16, 19 (1877). As discussed above, however, the reformation claim asserted here does not imperil the rights of any third party.
In any event, "The mere lapse of time does not constitute laches . . . unless it results in prejudice to the defendant . . . as where, for example, the defendant is led to change his position with respect to the matter in question." Bozzi v. Bozzi, 177 Conn. 232, 239, 413 A.2d 834
CT Page 1700 (1979). (Citations omitted.) There is no evidence of such prejudice here. The Bank first asserted its reformation claim in a counterclaim filed on September 10, 1998. (No. 129.) This was approximately three years after the Bank learned of the mistake in question. While this is an appreciable period of time, the equitable counterclaim is not barred by any statute of limitations. Delays far longer than this have been found to be not barred by the doctrine of laches. See Kurzatkowski v.Kurzatkowski, supra, 142 Conn. at 685 (holding that the lapse of twenty-five years before the institution of the plaintiff's suit did not constitute laches in the absence of prejudice). The only claim of prejudice that Traggis makes is that the Property was sold in the meantime. That fact, however, does not prevent the contract from being reformed. There being no showing of prejudice here, Traggis's special defense of laches must fail.
For the reasons set forth above, judgment shall enter on the counterclaim in favor of the counterclaim plaintiff, i.e. the Bank. The August 1994 contract is reformed to state a closing date of "August 15, 1994."
Jon C. Blue Judge of the Superior Court